UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WCO SPECTRUM, LLC,

*Plaintiff*,

v.

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.,

*Defendant*.

Civil Action No. 26-cv-1014

Hon. Vernon S. Broderick, U.S.D.J.
Hon. Robyn F. Tarnofsky, U.S.M.J.

**DEFENDANT HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

COZEN O'CONNOR
Jerry H. Goldfeder
Kerry T. Cooperman
Kamille E. Perry
3WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
(212) 509-9400

*Counsel for Defendant Hispanic Information and Telecommunications Network, Inc.*

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ... 1

FACTUAL BACKGROUND ... 3

A. HITN and the EBS Licenses ... 3

B. HITN's Conditional Exclusivity Agreement with WCO and Subsequent Sale of the EBS Licenses to T-Mobile ... 4

C. WCO's Baseless Demand for the Break-Up Fee and Commencement of This Action ... 7

LEGAL STANDARD ... 8

ARGUMENT ... 9

I. WCO FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT ... 9

A. The Plain Language of the Exclusivity Agreement—And Admissions in the Complaint—Establish WCO's Failure to Plead the Existence of an Agreement Between HITN and a ROFR Party Entered Into Within the Exclusivity Period ... 9

B. WCO's Allegation That T-Mobile's Exercise Of The Right of First Refusal Is An Agreement Is Contradicted By The Relevant Uncontroverted Contracts ... 12

C. The Lease Documents Incorporated Into The Complaint Confirm That A ROFR Exercise Does Not Constitute an Agreement Triggering an Obligation to Pay a Break-Up Fee Under Section 3 ... 14

D. HITN's Payment of the Break-Up Fee Would Defy the OAG's Direct Prohibition and Compel HITN to Violate the Law ... 15

II. WCO'S CLAIMS FOR UNJUST ENRICHMENT AND BREACH OF THE IMPLIED COVENANT SHOULD BE DISMISSED AS DUPLICATIVE OF WCO'S BREACH OF CONTRACT CLAIM ... 16

A. WCO's Unjust Enrichment Claim Is Duplicative of Its Breach Of Contract Claim ... 16

B. WCO's Implied Covenant Claim Is Duplicative of Its Breach of Contract Claim ... 17

CONCLUSION ... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*,
404 F.3d 566 (2d Cir. 2005)....10

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*,
136 F.3d 82 (2d Cir. 1998)....10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....8

*Barth Packaging, Inc. v. Excelsior Packaging Grp., Inc.*,
No. 7:11-cv-2563, 2011 WL 3628858 (S.D.N.Y. Aug. 16, 2011)....16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....8

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005)....19

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*,
516 N.E.2d 190 (N.Y. 1987)....16

*Cooper, Bamundo, Hecht & Longworth, LLP v. Kuczinski*,
14 A.D.3d 644 (N.Y. 2005)....16

*Corsello v. Verizon New York, Inc.*,
967 N.E.2d 1177 (N.Y. 2012)....16

*CP III Rincon Towers, Inc. v. Cohen*,
666 F. App'x 46 (2d Cir. 2016)....13

*Dalton v. Educ. Testing Serv.*,
663 N.E.2d 289 (N.Y. 1995)....19

*DiFolco v. MSNBC Cable LLC*,
622 F.3d 104 (2d Cir. 2010)....9

*Feifer v. Prudential Ins. Co.*,
306 F.3d 1202 (2d Cir. 2002)....10

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992)....13

*Glob. Reins. Corp. of Am. v. Century Indem. Co.*,
391 N.E.3d 1186 (N.Y. 2017)....................14

*Harrison v. Toptani Law Offs.*,
No. 11-cv-6801, 2012 WL 694755 (S.D.N.Y. March 2, 2012)....................16

*Int'l Audiotext Network v. AT&T Co.*,
62 F.3d 69 (2d. Cir. 1995)....................8

*J. Kokolakis Contracting Corp. v. Evolution Piping Corp.*,
No. 62727/2014, 2014 WL 5394461 (N.Y. Sup. Ct. Oct. 21, 2014)....................17

*Kamfar v. New WorldRest. Grp., Inc.*,
347 F. Supp. 2d 38 (S.D.N.Y. 2004)....................9

*KCG Ams. LLC v. Brazilmed, LLC*,
No. 15-cv-4600, 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016)....................17

*Kirch v. Liberty Media Corp.*,
449 F.3d 388 (2d Cir. 2006)....................8

*M/A-COM Sec. Corp. v. Galesi*,
904 F.2d 134 (2d Cir. 1990)....................19

*MBIA Ins. Corp. v. Merrill Lynch*,
81 A.D.3d 419 (N.Y. 2011)....................17

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
906 F.2d 884 (2d Cir. 1990)....................9

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Xerox Corp.*,
25 A.D.3d 309 (N.Y. 2006)....................17

*Negrete v. Citibank, N.A.*,
187 F. Supp. 3d 454 (S.D.N.Y. 2016)....................19

*Partner Canada Biomedical Int'l, Inc. v. Amgen, Inc.*,
No. 17-cv-5919, 2018 WL 3462516 (S.D.N.Y. July 17, 2018)....................9

*Photopaint Techs., LLC v. Smartlens Corp.*,
335 F.3d 152 (2d Cir. 2003)....................10

*Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*,
No. 16-cv-3787, 2017 WL 2240235 (S.D.N.Y. Mar. 29, 2017)....................18, 19

*Slattery Skanska Inc. v. Am. Home Assur. Co.*,
67 A.D.3d 1 (N.Y. 2009)....................12

*Sutton v. E. River Sav. Bank*,
435 N.E.2d 1075 (N.Y. 1982)....................10

*Swan Media Grp., Inc. v. Staub*,
841 F. Supp. 2d 804 (S.D.N.Y. 2012)....................9

*Ullmann-Schneider v. Lacher & Lovell-Taylor, P.C.*,
121 A.D.3d 415 (1st Dep't 2014) ....................18

*Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
37 N.E.3d 675 (N.Y. 2015)....................10

*Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*,
281 N.E.2d 142 (N.Y. 1972)....................19

*Walker v. Thomson*,
404 F. Supp. 3d 819 (S.D.N.Y. 2019)....................9, 13

**Statutes**

Communications Act Section 310(d)....................7

Internal Revenue Code Section 501(c)(3)....................1

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ....................2, 7, 8

Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN" or "Defendant") respectfully moves to dismiss the Complaint, dated February 5, 2026 (ECF No. 1, the "Complaint" or "Compl."), and the within action commenced by Plaintiff WCO Spectrum, LLC ("WCO" or "Plaintiff").

## PRELIMINARY STATEMENT

This case is an unlawful attempt by WCO, a private investment firm that invests in Educational Broadband Service ("EBS") spectrum licenses, to extract an approximately $15 million alleged break-up fee ("Break-Up Fee")[1] from HITN, a New York charitable not-for-profit corporation exempt from tax under Section 501(c)(3) of the Internal Revenue Code. As a matter of law, and pursuant to the unambiguous terms of the parties' long-expired agreement, HITN does not owe the Break-Up Fee to WCO.

As explained below, HITN contracted to pay a Break-Up Fee to WCO if, and only if, *inter alia*, HITN subsequently entered into a contract to sell EBS spectrum licenses to another buyer (which held a right of first refusal with respect to the purchase of the licenses) during a defined exclusivity period. HITN eventually entered into a contract to sell the EBS spectrum licenses to another buyer, but that occurred long after the expiration of the contractual exclusivity period. Accordingly, WCO is not entitled to any Break-Up Fee from HITN.

The dispositive facts, meriting dismissal of WCO's Complaint in its entirety under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), are undisputed:

1. On July 29, 2020, following an offer by WCO in July 2020 to purchase 49 EBS spectrum licenses (the "EBS Licenses") from HITN for approximately $251

---

[1] As used herein, the "Break-Up Fee" refers to a contingent contractual payment that WCO claims HITN was required to pay upon the occurrence of certain conditions specified in the parties' July 2020 Exclusivity Agreement (defined below), namely, HITN's entry into a transaction with its existing lessee following the lessee's exercise of a contractual right of first refusal based on WCO's offer to acquire HITN's EBS licenses. *See* Compl. ¶¶ 2-6, 24-25; *id.* Ex. A § 3.

million, WCO and HITN entered into an "Exclusivity and Break-Up Fee Agreement," dated July 29, 2020 (the "Exclusivity Agreement"). *See* Compl. ¶ 21; *id.* at Exs. A, B.

2. The Exclusivity Agreement obligated HITN to pay a Break-Up Fee to WCO **only if**, in relevant part, (i) HITN thereafter "enter[ed] into an agreement" with a third party (the "ROFR Party"), pursuant that third party's "exercise of" a right of first refusal ("ROFR") to purchase the EBS Licenses, "on the basis of the [WCO] Offer"; ***and*** (ii) such agreement between HITN and the ROFR Party was entered into within an "Exclusivity Period" that expired on January 29, 2021. *See* Compl. Ex. A §§ 2-3.

3. HITN did not enter into any agreement with any ROFR Party (or anyone else) concerning any of the EBS Licenses until September 29, 2021, eight months after the Exclusivity Period expired. *See* Compl. ¶ 29.

WCO's Complaint does not plead the existence of any agreement between HITN and a ROFR Party within the Exclusivity Period—and the undisputed fact, as WCO concedes in its Complaint, is that the first agreement between HITN and a ROFR Party concerning the EBS Licenses was an agreement between HITN and T-Mobile entered into on September 29, 2021 (long after the Exclusivity Period ended). *Id.* Therefore, this Court should dismiss WCO's breach of contract claim, pursuant to FRCP 12(b)(6), for failure to state a claim and based on undisputed documentary evidence.

As discussed herein, WCO's erroneous argument that T-Mobile's mere notice of intention to exercise its ROFR within the Exclusivity Period entitled WCO to payment of the Break-Up Fee, Compl. ¶¶ 28-29, 40-45, directly contravenes the unambiguous language of the Exclusivity Agreement and does not come close to stating a claim upon which relief can be granted. *See infra* Argument § I.

Moreover, as HITN had already informed WCO before this action was filed, in addition to the fact that no Break-Up Fee is due under the Exclusivity Agreement, the New York State Office of the Attorney General (the "OAG") directedly prohibited HITN from paying the Break-Up Fee. Specifically, as discussed below further, the OAG, a primary regulator of New York not-for-profit

corporations like HITN, reviewed WCO's demand and informed HITN, in relevant part, that HITN is "not authorized to use its charitable assets to satisfy the demanded payment," any such payment by HITN "could be a breach of [HITN's officers, directors, and key persons'] fiduciary duties," and payment of the fee "would be an improper expenditure." *See* Declaration of Jerry H. Goldfeder, dated September 4, 2026 ("Goldfeder Decl.") Ex. A at 2. While WCO acknowledges, as it must, that the OAG has regulatory oversight and enforcement authority concerning the operations and expenditures of HITN, it failed to include in its Complaint that it had been advised that the OAG forbade the payment that WCO seeks.

Finally, as detailed below, WCO's claims for unjust enrichment and breach of the implied covenant of good faith and fair dealing must be dismissed as a matter of law as they are duplicative of WCO's breach of contract claim.

Accordingly, this Court should dismiss the Complaint and this proceeding in its entirety.

## FACTUAL BACKGROUND

### A. HITN and the EBS Licenses

HITN has been operating in New York City for more than four decades. Its charitable mission is "to advance the educational, cultural and socio-economic aspirations of U.S Hispanics through the development and distribution of quality and authentic content, on-air, online and on the ground."[2] As a New York charitable not-for-profit corporation, it is governed by New York's Not-for-Profit Corporation Law ("N-PCL") and its operations are regulated by the OAG and supervised by the Charities Bureau of the OAG.

HITN was the holder of the 49 EBS Licenses that are the subject of this lawsuit. EBS licenses are authorizations from the U.S. Federal Communications Commission ("FCC") that,

[2] *See* HITN, "About HITN", https://www.hitn.org/about-us/ (last visited Sept. 3, 2026).

subject to applicable law, allow qualified holders of those licenses to possess, use, and transfer designated wireless spectrum for educational and related broadband purposes. Each of the 49 EBS Licenses held by HITN was subject to a lease agreement (collectively, the "Lease Agreements") containing a ROFR in favor of a then-lessee affiliated with Clearwire Spectrum Holdings LLC and/or Fixed Wireless Holdings LLC (the "Lessees").[3]

The Lease Agreements provided the Lessees with long-term rights to access and commercially utilize the spectrum associated with the EBS Licenses for wireless broadband operations in exchange for consideration paid to HITN. Because the Lessees had long-term operational and economic interests in continued access to that spectrum, the Lease Agreements also granted them a ROFR, providing an opportunity for the Lessees to acquire the corresponding EBS Licenses if HITN later elected to pursue a sale under specified circumstances. *See generally* Goldfeder Decl. Ex. B. The Lessees' interests were subsequently acquired by T-Mobile US, Inc. Compl. ¶¶ 18-20 & n.1.[4]

### B. HITN's Conditional Exclusivity Agreement with WCO and Subsequent Sale of the EBS Licenses to T-Mobile

***WCO's Non-Binding Offer to HITN*.** On July 29, 2020, WCO submitted to HITN a written offer to acquire the 49 EBS Licenses and related Lease Agreements from HITN for consideration totaling approximately two hundred fifty one million dollars ($251,000,000) (the "Non-Binding Offer"). Compl. ¶ 21; *id.* Ex. B.

[3] True and correct copies of the pertinent Lease Agreements are collectively annexed as Exhibit B to the Goldfeder Decl.

[4] For the convenience of the Court, this ultimate purchaser of the relevant licenses will be referred to herein as "T-Mobile." *See* Compl. ¶ 18 & n.1.

The Non-Binding Offer expressly stated that it was "solely a non-binding offer" and "should not be considered a legally binding indication or agreement in any manner." Compl. Ex. B. The accompanying term sheet likewise provided that it was offered for "DISCUSSION PURPOSES ONLY," did not constitute a binding agreement, and contemplated the future execution of "Definitive Agreements." *Id.* This or any other offer, in order to result in an agreement between the parties, was subject to due diligence, customary closing conditions, regulatory approvals, and the execution of future binding transaction documents. *Id.*

***Exclusivity Agreement Between WCO and HITN*****.** Concurrent with WCO's submission of the Non-Binding Offer to HITN, WCO and HITN entered into the Exclusivity Agreement. Compl. ¶ 22; *id.* Ex. A. The Exclusivity Agreement expressly provided that WCO had submitted a Non-Binding Offer and contemplated the future "evaluation, negotiation and documentation" of the proposed transaction between HITN and WCO. Compl. Ex. A, Recitals. The terms of the Exclusivity Agreement also provided a defined "Exclusivity Period" that expired on January 29, 2021—six months after the Exclusivity Agreement was executed—and expressly provided that WCO would be entitled to a Break-Up Fee if, and only if, specifically enumerated preconditions were satisfied within that Exclusivity Period. *Id.* §§ 2-3.

The specifically enumerated preconditions were spelled out in Sections 3 and 6(b) of the Exclusivity Agreement, the first of which provided that HITN was obligated to pay WCO a Break-Up Fee only if—during the Exclusivity Period ("the six-month anniversary of the date [of the Exclusivity Agreement]")—HITN "enter[ed] into an agreement with a ROFR Party or any of its Affiliates pursuant to an exercise of a ROFR Provision on the basis of the Offer." Compl. Ex. A § 3. Section 6(b) of the Exclusivity Agreement provided that, as part of the ROFR process, HITN

would engage in "discussions, negotiations or one or more definitive agreements for a ROFR Transaction." *Id.*

Thus, for WCO to earn a Break-Up Fee, there had to be an actual subsequent agreement between HITN and another party during the Exclusivity Period. There was not any such agreement.

***T-Mobile's Exercise of Its ROFR*.** On August 14, 2020, pursuant to the ROFR provision in the Lease Agreements, HITN delivered written notice to T-Mobile of WCO's Non-Binding Offer (the "Notice"). Compl. ¶ 27; *id.* Exs. A at 1, C. The Notice annexed the terms of WCO's Non-Binding Offer, advised T-Mobile that HITN intended to sell the EBS Licenses to WCO pursuant to the terms of that offer, and informed T-Mobile of its right to exercise or waive its ROFR. Compl. Ex. C.

On September 11, 2020, T-Mobile notified HITN that it intended to exercise its ROFR with respect to all EBS Licenses covered by WCO's Non-Binding Offer. Compl. ¶ 28.

***HITN's Sale of the EBS Licenses to T-Mobile*.** HITN and T-Mobile thereafter proceeded—over the course of more than a year—with "discussions and negotiations" of the terms and language of the agreement for T-Mobile's purchase of the EBS Licenses from HITN (as expressly contemplated by § 6(b) of the Exclusivity Agreement). *See* Compl. ¶¶ 28-29; *id.* Ex. A. T-Mobile and HITN did not sign a license purchase agreement for T-Mobile's purchase of the EBS Licenses (the "Agreement") until September 29, 2021. *See* Compl. ¶¶ 29-30. The Agreement was therefore executed long after the 6-month Exclusivity Period had expired (on January 29, 2021). *See* Compl. Ex. A. § 2.

Moreover, the Agreement provided that a precondition to the closing of T-Mobile's purchase of the EBS Licenses was receipt of legally required approvals from the FCC and the

OAG Charities Bureau.[5] Accordingly, after HITN and T-Mobile signed the Agreement, HITN sought approval of the transaction from both the FCC and the OAG Charities Bureau. Compl. ¶ 30. The regulatory approval processes, specifically for the OAG's Charities Bureau's approval of the transaction, proceeded over several years. Compl. ¶¶ 31-34. On May 18, 2022, HITN submitted a final proposed petition to the OAG for approval of the sale of the 49 EBS Licenses. On July 12, 2023, the OAG Charities Bureau notified HITN that the OAG would not approve the transaction under the Agreement.[6] Though HITN ultimately closed "on its sale of the EBS license to T-Mobile" on October 24, 2024 (pursuant to a subsequent agreement) as WCO concedes, no agreement was entered into and no sale occurred during the Exclusivity Period. *See* Compl. ¶¶ 28-34.

### C. <u>WCO's Baseless Demand for the Break-Up Fee and Commencement of This Action</u>

In September 2024, WCO raised with HITN the issue of the Break-Up Fee in connection with HITN's closing of the sale of the EBS Licenses to T-Mobile and demanded payment under the Exclusivity Agreement. *See* Compl. Ex. D. On October 28, 2024, HITN advised WCO that HITN did not owe and would not pay WCO its claimed Break-Up Fee because, among other reasons, the Agreement was not entered into during the Exclusivity Period. Compl. ¶ 35.

---

[5] When a New York charitable not-for-profit corporation seeks to sell, assign, lease, or otherwise transfer an EBS license, there is a dual regulatory framework: (1) the N-PCL, enforced by the OAG's Charities Bureau, which requires either OAG or court approval for dispositions of all or substantially all charitable assets; and (2) the FCC, which requires prior consent for any assignment or transfer of control of an FCC license under Section 310(d) of the Communications Act. *See* N-PCL 510(3); 47 U.S.C. § 310(d).

[6] Whether the OAG subsequently approved the terms of the Agreement is irrelevant to the explicit and unambiguous six-month deadline in the Exclusivity Agreement because the Exclusivity Agreement did not address, and its terms were not subject to, this approval process. *See generally* Compl. Ex. A. The Exclusivity Agreement only required, as a precondition to HITN's obligation to pay the Break-Up Fee, that HITN "enter[] into an agreement with a ROFR Party . . ." during the Exclusivity Period, and this did not occur. *See id.* §§ 2(a), 3.

Nevertheless, on December 2, 2024, WCO sent a demand letter to HITN demanding payment of the Break-Up Fee. *See* Goldfeder Decl. Ex. C. HITN, through its attorneys, responded that the Exclusivity Agreement was no longer in effect, and, in any event, that the OAG had expressly forbade HITN from paying this Break-up Fee. *See* Goldfeder Decl. Ex. A.

Over a year after sending its "demand letter," on February 5, 2026, WCO commenced this action, asserting claims for breach of contract, unjust enrichment, and breach of the implied covenant of good faith and fair dealing. Compl. ¶¶ 39-57.

HITN seeks dismissal of the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

## LEGAL STANDARD

On a motion to dismiss under FRCP 12(b)(6), a court must assess whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a motion to dismiss. *Id.* at 663. Although a court must accept the truth of factual allegations, it need not credit "a legal conclusion couched as a factual allegation" or "'labels and conclusions' or 'a formulaic recitation of the elements." *Id.* at 678; *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006) (cleaned up) ("Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss.").

In deciding a motion to dismiss, a court must interpret and apply the terms of an unambiguous contract relied upon in the pleadings as drafted. *Int'l Audiotext Network v. AT&T Co.*, 62 F.3d 69, 72 (2d. Cir. 1995). The Court is "not constrained to accept the allegations of the complaint in respect of the construction" of a contract. *Id.* Instead, "[u]nder New York law, the

initial interpretation of a contract is a matter of law for the court to decide." *Partner Canada Biomedical Int'l, Inc. v. Amgen, Inc.*, No. 17-cv-5919, 2018 WL 3462516, at *2 (S.D.N.Y. July 17, 2018) (quoting *Kamfar v. New WorldRest. Grp., Inc.*, 347 F. Supp. 2d 38, 48-49 (S.D.N.Y. 2004)). Disagreement between the parties over the meaning of terms in the contract does not render the contract ambiguous. *Walker v. Thomson*, 404 F. Supp. 3d 819, 823 (S.D.N.Y. 2019) (citing *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)).

While WCO failed to attach all relevant contracts or other documents referenced in and relied upon in the Complaint, the Court may consider them on this motion to dismiss. Indeed, the Court may base its analysis not only on facts alleged in a complaint and on exhibits to a complaint, but also on documents incorporated by reference in a complaint and documents integral to it. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 104, 111 (2d Cir. 2010). Courts may also consider "documents that the plaintiff relied on in bringing suit." *Swan Media Grp., Inc. v. Staub*, 841 F. Supp. 2d 804, 806 (S.D.N.Y. 2012).

As detailed below, this Court should dismiss the Complaint because WCO failed to state a claim in that the Complaint cannot and does not allege facts establishing that HITN entered into an agreement with a ROFR Party during the Exclusivity Period, as required by Section 3 of the Exclusivity Agreement. Moreover, this Court should dismiss the Complaint because the very documents incorporated into and relied upon by the Complaint confirm that a ROFR exercise is not an agreement contemplated by Section 3 and therefore could not trigger any obligation to pay a Break-Up Fee.

## ARGUMENT

### I. WCO FAILS TO STATE A CLAIM FOR BREACH OF CONTRACT

#### A. The Plain Language of the Exclusivity Agreement—And Admissions in the Complaint—Establish WCO's Failure to Plead the Existence of an Agreement Between HITN and a ROFR Party Entered Into Within the Exclusivity Period

"Under New York law 'the initial interpretation of a contract is a matter of law for the court to decide.' Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (quotations omitted); *see also Sutton v. E. River Sav. Bank*, 435 N.E.2d 1075, 1075 (N.Y. 1982) ("[T]he threshold decision on whether a writing is ambiguous is the exclusive province of the court."). "It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co.*, 306 F.3d 1202, 1210 (2d Cir. 2002).

"Contract language is unambiguous when," as here, "it has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Photopaint Techs., LLC v. Smartlens Corp.*, 335 F.3d 152, 160 (2d Cir. 2003) (cleaned up). "[T]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning." *Aetna Cas. & Surety Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 598 (2d Cir. 2005) (cleaned up); *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 37 N.E.3d 675, 680 (N.Y. 2015) (cleaned up) ("[P]arties cannot create ambiguity from whole cloth where none exists").

Here, the unambiguous language of the Exclusivity Agreement and WCO's own allegations in its Complaint confirm that WCO failed to state a claim for breach of contract or entitlement to a Break-Up Fee under the Exclusivity Agreement. *See* Compl. ¶¶ 28-29. It is undisputed that HITN only owed the Break-Up Fee if (1) a ROFR Party exercises a ROFR on the basis of WCO's offer to HITN and (2) HITN and the ROFR Party thereafter enter into an

agreement, based on that offer, within the 6-month Exclusivity Period. Compl. Ex. A § 3. Specifically:

> In addition and without limiting the foregoing, if, at any time ***during the Exclusivity Period***, Company ***enters into an agreement*** with a ROFR Party or any of its Affiliates pursuant to an exercise of a ROFR Provision on the basis of the Offer (each, a "ROFR Transaction"), then Company agrees to pay to an account designated by WCO a break-up fee with respect to each License included in such ROFR Transaction equal to the amount set forth on Exhibit A opposite such License under the heading "Break-Up Fee" (each, a "Break-Up Fee") within five (5) business days following the date that Company has received all or a portion of the consideration with respect to such ROFR Transaction, whether the receipt of such consideration occurs during or after the Exclusivity Period.

Compl. Ex. A § 3 (emphasis supplied). As an incontrovertible matter of law, HITN and T-Mobile did not enter into any agreement, based on the Non-Binding Offer or any other offer, within the Exclusivity Period. Compl. ¶ 29 (admitting that the Agreement with T-Mobile was not entered into until September 29, 2021, a full eight months after expiration of Exclusivity Period). Accordingly, the right to a Break-Up Fee was never triggered, and that fact alone should lead to dismissal without any further analysis by the Court.

Nevertheless, in a self-evident attempt to circumvent the terms of the Exclusivity Agreement, and to create the misperception of ambiguity where none exists, WCO repeatedly mischaracterizes the language of the Exclusivity Agreement. Contrary to WCO's assertion, the Exclusivity Agreement does not entitle WCO to a Break-Up Fee based on T-Mobile's mere notice of exercise of a ROFR. And, while WCO alleges that T-Mobile exercised a ROFR based on WCO's Non-Binding Offer to HITN, Compl. ¶ 28, it pleads no facts stating or showing that HITN and T-Mobile (or any other ROFR Party) ever executed a written agreement within the Exclusivity Period—a condition precedent for payment of the Break-Up Fee. Compl. Ex. A § 3.

WCO's claim therefore fails as a matter of law and, with no factual or legal basis to support WCO's claim, this Court should dismiss Count I of the Complaint with prejudice.

### B. WCO's Allegation That T-Mobile's Exercise Of The Right of First Refusal Is An Agreement Is Contradicted By The Relevant Uncontroverted Contracts

In Count I of its Complaint, WCO alleges that T-Mobile's September 2020 notice of exercise of its ROFR itself constituted an "agreement" triggering WCO's entitlement to a Break-Up Fee under Section 3 of the Exclusivity Agreement. WCO further contends that the Agreement signed on September 29, 2021 merely "memorialized" that prior purported agreement. *See generally* Compl. ¶¶ 28-29, 39-43.

The Court should reject this attempt to circumvent WCO's failure to plead the existence of an agreement between a ROFR Party and HITN entered into within the Exclusivity Period. Section 3 of the Exclusivity Agreement does not provide or suggest that a ROFR Party's mere notice of exercise of a ROFR constitutes an agreement giving rise to WCO's right to a Break-Up Fee. Compl. Ex. A § 3.[7] Indeed, the Exclusivity Agreement distinguishes between (1) a ROFR Party's notice of exercise of its ROFR (which notice is not an "agreement") and (2) a subsequent agreement between HITN and the ROFR Party entered into pursuant to that exercise of the ROFR. Compl. Ex. A § 3. This is underscored by the Lease Agreements, which draw a clear distinction between the delivery of notice of exercise of a ROFR and a subsequent agreement between a ROFR Party and HITN. *See, e.g.*, Goldfeder Decl. Ex. B-1 § 3(b). And the Complaint itself identifies only one purportedly operative agreement—the Agreement (dated September 29, 2021), which indisputably falls outside the Exclusivity Period—and fails even to allege the existence of any other agreement. Compl. ¶¶ 28-29; *id.* Ex. A § 2(a).

---

7 The meaning of "agreement" has no ambiguity and need not be defined. *Slattery Skanska Inc. v. Am. Home Assur. Co.*, 67 A.D.3d 1, 14 (N.Y. 2009).

The structure and other provisions of the Exclusivity Agreement reinforce this. Section 4, for example, provides that where a ROFR Party does not exercise its ROFR rights, HITN and WCO "shall negotiate in good faith and use their respective reasonable best efforts to ***enter into an [asset purchase agreement]***" reflecting the terms of WCO's offer. Compl. Ex. A § 4 (emphasis supplied). Section 6(b) likewise provides that, in connection with the ROFR process, HITN may engage in "discussions, negotiations or one or more ***definitive agreements*** for a ROFR Transaction" and then explicitly requires "agreements" and not merely negotiations. *Id.* § 6(b) (emphasis supplied).

If mere notice of exercise of a ROFR were deemed an "agreement" triggering the obligation to pay a Break-Up Fee under Section 3, as WCO erroneously argues, these provisions of the Exclusivity Agreement would be rendered meaningless—a result that would run counter to basic contract law. *See Walker v. Thompson*, 404 F. Supp. 3d 819, 824 (S.D.N.Y. 2019) (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992)) (cleaned up) ("Under New York law an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible."); *CP III Rincon Towers, Inc. v. Cohen*, 666 F. App'x 46, 51 (2d Cir. 2016) ("It is well-established that we disfavor readings of a contract that render provisions of an agreement superfluous."). By way of example, if WCO were correct, Section 6(b)'s reference to "discussions," "negotiations," and "one or more definitive agreements for a ROFR Transaction" would be meaningless because the "agreement" would already have come into existence upon the ROFR exercise. Compl. Ex. A. The requirement in Section 3 that HITN "enter[] into an agreement" would likewise serve no independent purpose. *Id.* And the phrase "pursuant to an exercise of a ROFR Provision" would be rendered superfluous as there would be no separate agreement entered into pursuant to the exercise. *Id.* § 3.

Moreover, WCO's Complaint itself demonstrates that there was no agreement between HITN and T-Mobile until execution of the Agreement on September 29, 2021. *See* Compl. ¶¶ 28-29; *id.* Ex. A § 2. Arguing that the Agreement was merely "memorialized" on that date is a disingenuous attempt to suggest that an actual agreement was made earlier. *Id.* ¶ 29. If WCO's position were legitimate, the Complaint would have alleged, *inter alia*, the date on which a purported agreement between HITN and T-Mobile was entered into within the Exclusivity Period, who entered into such agreement, what the agreement's material terms were, and whether those terms were binding. WCO failed to plead any of this because no agreement between HITN and T-Mobile was executed during the Exclusivity Period.

Simply put, the Exclusivity Agreement means what it says: a Break-Up Fee is permitted only if, during the Exclusivity Period, HITN enters into an agreement with a ROFR Party pursuant to the exercise of a ROFR. Compl. Ex. A § 3. This reading also harmonizes the Exclusivity Agreement's provisions and gives meaning to the parties' distinction between a ROFR exercise and the later definitive agreement resulting from that exercise. *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 391 N.E.3d 1186, 1193 (N.Y. 2017) (cleaned up) ("[W]here an agreement is negotiated between sophisticated, counseled business people negotiating at arm's length, courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.").

### C. <u>The Lease Documents Incorporated Into The Complaint Confirm That A ROFR Exercise Does Not Constitute an Agreement Triggering an Obligation to Pay a Break-Up Fee Under Section 3</u>

This Court should not consider extrinsic evidence in dismissing Count I of WCO's Complaint because, on its face, the Complaint failed to state a claim and the Agreement is unambiguous. *W.W.W. Assocs.*, 566 N.E.2d at 641-42. However, in the event the Court decides to consider the Lease Agreements (referenced throughout the Complaint, and as such incorporated

therein), such Lease Agreements confirm that a ROFR exercise is not an "agreement" triggering an obligation to pay a Break-Up Fee under Section 3 of the Exclusivity Agreement. *See* Compl. ¶¶ 27-32 (citing Compl. Ex. C-D); *see, e.g.*, Goldfeder Decl. Ex. B-1 § 3(b).

The Complaint repeatedly relies on the underlying Lease Agreements and the ROFRs therein to suggest that a ROFR exercise is an agreement giving rise to HITN's obligation to pay the Break-Up Fee. *See e.g.*, Compl. ¶¶ 18-20, 24-25, 27-30. But the Lease Agreement expressly provide that an agreement is to be executed to effectuate the transaction ***after*** the exercise of a ROFR (which, as a matter of law, is not an agreement at all). *See, e.g.*, Goldfeder Decl. Ex. B-1 § 3(b). Specifically, the Lease Agreement states that the terms of any agreement "resulting from the exercise" of the ROFR "will be ratified in a separate agreement." *Id.* Accordingly, the Lease Agreement reinforces that the notice of exercise of a ROFR is not an "agreement" triggering a Break-Up Fee payment obligation under Section 3 of the Exclusivity Agreement. Compl. Ex. A.

### D. HITN's Payment of the Break-Up Fee Would Defy the OAG's Direct Prohibition and Compel HITN to Violate the Law

Finally, as noted above, it is undisputed that the OAG reviewed WCO's demand for the Break-Up Fee and thereafter directed that HITN is "not authorized" to pay it and that paying it would be an "unauthorized expenditure." Goldfeder Decl. Ex. A at 2. Accordingly, the relief WCO seeks in this case would compel HITN to violate the OAG's expressly communicated prohibition and thus to violate the law (as HITN is subject to the OAG's regulatory oversight and directives, including directives regarding the use of proceeds of the transaction that closed). Moreover, according to the OAG's direct warning, HITN's payment of the Break-Up Fee would subject HITN to potential liability for "breach of fiduciary duties." *Id.*

In short, WCO cannot seek relief that requires HITN to violate the law and to defy the OAG. For this additional reason, the Complaint fails as a matter of law.

Accordingly, Count I of the Complaint should be dismissed for failing to state a claim and upon documentary evidence.

## II. WCO'S CLAIMS FOR UNJUST ENRICHMENT AND BREACH OF THE IMPLIED COVENANT SHOULD BE DISMISSED AS DUPLICATIVE OF WCO'S BREACH OF CONTRACT CLAIM

### A. WCO's Unjust Enrichment Claim Is Duplicative of Its Breach Of Contract Claim

The existence of a valid and enforceable contract governing the same subject matter as an unjust enrichment claim precludes a quasi-contract claim. *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987). "[U]njust enrichment is not a catchall cause of action to be used when others fail. It is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to plaintiff." *Corsello v. Verizon New York, Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012).

Courts routinely dismiss unjust enrichment claims in this context. *See, e.g.*, *Harrison v. Toptani Law Offs.*, No. 11-cv-6801, 2012 WL 694755, at *2 (S.D.N.Y. March 2, 2012) (dismissing *quantum meruit* and unjust enrichment claims because claims arose from an alleged failure to a pay a fee purportedly owed under a contract); *Barth Packaging, Inc. v. Excelsior Packaging Grp., Inc.*, No. 7:11-cv-2563, 2011 WL 3628858, at *2 (S.D.N.Y. Aug. 16, 2011) (dismissing unjust enrichment claim because the claim was based on performance under a contract); *Cooper, Bamundo, Hecht & Longworth, LLP v. Kuczinski*, 14 A.D.3d 644, 645-46 (N.Y. 2005) (finding dismissal of *quantum meruit* and unjust enrichment claims was required when a contract between the parties precluded recovery under both theories).

Here, the existence of a contract—the Exclusivity Agreement—is undisputed. WCO asserts a "valid, binding, and enforceable contract . . . ." Compl. ¶¶ 22, 40, 55. It claims breach

of that Exclusivity Agreement. And it seeks damages in the amount of the purported Break-Up Fee under Section 3 of the Exclusivity Agreement. Compl. ¶ 53. WCO does not seek any damages or compensation for a service performed in addition to what is set forth in the Exclusivity Agreement. *See generally* Compl. ¶¶ 46-53. This precludes WCO's unjust enrichment claim. *See Remora Cap. S.A.*, 175 A.D.3d at 1221 (citation omitted) ("The unjust enrichment claim must be dismissed because it arises from matters covered by the contracts."); *KCG Ams. LLC v. Brazilmed, LLC*, No. 15-cv-4600, 2016 WL 900396, at *6-7 (S.D.N.Y. Feb. 26, 2016) (rejecting plaintiffs' argument that its unjust enrichment "claim should survive as an alternative theory of liability to breach of contract, [because] such an option is only viable when . . . the validity of the underlying contract is in dispute.").

### B. WCO's Implied Covenant Claim Is Duplicative of Its Breach of Contract Claim

A claim for breach of the implied covenant of good faith and fair dealing must also be dismissed if it is, as here, "premised on the same conduct that underlies the breach of contract cause of action and is intrinsically tied to the damages resulting from the breach of contract." *MBIA Ins. Corp. v. Merrill Lynch*, 81 A.D.3d 419, 419-20 (N.Y. 2011) (quotations omitted). "Where a contractual party is merely seeking to reap the benefits of its contractual bargain, the implied covenant breach claim will not lie as it is considered duplicative of the breach of contract claim." *J. Kokolakis Contracting Corp. v. Evolution Piping Corp.*, No. 62727/2014, 2014 WL 5394461, at *2 (N.Y. Sup. Ct. Oct. 21, 2014) (citations omitted); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Xerox Corp.*, 25 A.D.3d 309, 310 (N.Y. 2006) (dismissing plaintiff's claim for breach of the covenant of good faith and fair dealing as "merely a substitute for plaintiff's nonviable contract claims").

More specifically, an alleged "[b]reach of the implied covenant of good faith and fair dealing is merely a[n alleged] breach of the underlying contract[, t]hus, there is no separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled." *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, No. 16-cv-3787, 2017 WL 2240235, at *6-7 (S.D.N.Y. Mar. 29, 2017) (cleaned up) (dismissing implied covenant claim as identical of breach of contract claim, where plaintiff alleged that defendants breached "the implied covenant by failing to pay any Breakup Fee[,]" and asserted a "breach of contract based on Defendants' refusal to pay the Breakup Fee"). When both are pled, a "claim for breach of the implied covenant of good faith and fair dealing must be dismissed as redundant of the breach of contract claims." *Remora Cap. S.A.*, 175 A.D.3d at 1221 (citation omitted); *see also Ullmann-Schneider v. Lacher & Lovell-Taylor, P.C.*, 121 A.D.3d 415, 416 (1st Dep't 2014) (citation omitted) (where breach of implied covenant and unjust enrichment claims were "based on the same allegations and s[ought] the same damages as the breach of contract . . . claim [for breach of implied covenant] should have been dismissed as duplicative"); *Int'l Techs. Mktg.*, 157 F. Supp. 3d at 369 (concluding that because the allegations identified by plaintiff as supporting an independent breach of implied covenant claim were the same facts alleged as the basis for the breach of contract claim, "[a]ny freestanding claim for a breach of the covenant of good faith and fair dealing, based on the same allegations, are redundant and must also be dismissed").

This is exactly what WCO is improperly attempting to do here. As with its unjust enrichment claim, WCO's claim for breach of the implied covenant of good faith and fair dealing is merely a breach-of-contract allegation in disguise, in that it fails to allege any wrongdoing or

harm that is separate from its breach of contract claim. *See* Compl. ¶¶ 54-57. WCO's implied covenant claim should be dismissed on that basis.

Furthermore, a party cannot use the implied covenant to "add to the contract a substantive provision not included by the parties." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (cleaned up); *see also Negrete v. Citibank, N.A.*, 187 F. Supp. 3d 454, 470 (S.D.N.Y. 2016) ("An implied covenant does not independently create additional duties extraneous to the parties' agreements."); *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291-92 (N.Y. 1995) (cleaned up) ("no obligation can be implied that would be inconsistent with other terms of the contractual relationship"). Nor will a court interpret the implied covenant to "extend so far as to undermine a party's 'general right to act on its own interests in a way that may incidentally lessen' the other party's anticipated fruits from the contract." *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990) (quoting *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 281 N.E.2d 142, 145 (N.Y. 1972)). Yet this is exactly what WCO seeks to do here by treating the exercise of the ROFR by T-Mobile as identical to T-Mobile entering into a binding agreement with HITN. If WCO wanted such a term, it should have bargained for it in its Exclusivity Agreement with HITN. WCO did not do so, and it cannot use an implied covenant claim to achieve through litigation what it failed to achieve through negotiation of the contract.

Finally, WCO's implied covenant claim seeks the same damages as its breach of contract claim, thus undercutting its validity as an independent claim. "[A]ny damages recovered for the alleged breach of the implied covenant" based on WCO's allegations "would be intrinsically tied to the alleged breach of contract for" the same allegations. *Rennaker*, 2017 WL 2240235 at *6-7. This also requires dismissal of the unjust enrichment claim.

Thus, WCO's claims under its theories of unjust enrichment, unfair dealing, and breach of an implied covenant lack validity and must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice.

Dated: September 4, 2026
New York, New York

COZEN O'CONNOR

By: */s/ Jerry H. Goldfeder*

Jerry H. Goldfeder
Kerry T. Cooperman
Kamille E. Perry
3WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
(212) 509-9400
jgoldfeder@cozen.com
kcooperman@cozen.com
kperry@cozen.com

*Counsel for Defendant Hispanic Information and Telecommunications Network, Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION**

I hereby certify that this Memorandum of Law contains 5,946 words, excluding the caption, table of contents, table of authorities, signature block, and this certification.

Pursuant to Judge Broderick's Individual Rules and Practices, memoranda of law in support of and opposition to motions are limited to 8,750 words. Counsel certifies that this memorandum complies with that limitation.

Dated: September 4, 2026
New York, New York

*/s/ Jerry H. Goldfeder*
Jerry H. Goldfeder

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** has been filed electronically and is available for viewing and downloading from the ECF System, and is being served upon all counsel of record via ECF transmission in accordance with the Electronic Filing System of the Court, on September 4, 2026.

/s/ *Jerry H. Goldfeder*
Jerry H. Goldfeder